UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| CECILIA WILSON, as guardian for R.W., a minor; KEVIN and CECLIA WILSON, husband and wife; CANDACE DAWSON, as guardian for J.D.; CANDACE DAWSON, individually; CANDI LANDIS, as guardian for A.L., a minor; BRANDON BASTIN, as guardian for J.M.B., a minor, TESSA GREEN, as guardian for W.L., a minor; JANE DOES 1-10; and JOHN DOES 1-10,<br><br>     Plaintiffs,<br> v.<br><br>LONGVIEW SCHOOL DISTRICT, a municipal corporation; MINT VALLEY ELEMENTARY SCHOOL, a municipal corporation; JERRY STEIN, in his individual capacity; PATRICK KELLEY, in his official and individual capacity; SUZANNE CUSICK, in her official and individual capacity; NANCY BEAN, in her official and individual capacity; JANE DOES 1-0; and JOHN DOES 1-10,<br><br>     Defendants. | CASE NO. 15-cv-5863 RJB<br><br>ORDER ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT |

ORDER ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 1

This matter comes before the Court on Defendants' Partial Motion for Summary Judgment (Dkt. 41) and Defendants' motion to strike (Dkt. 51). The Court has considered the pleadings filed in support of and in opposition to the motions and the file herein.

This case arises from Defendants' alleged use of a four foot by four foot isolation booth to discipline children attending Mint Valley Elementary School ("Mint Valley") in Longview, Washington. Dkt. 22. In their Amended Complaint, filed June 29, 2016, Plaintiffs make claims for violations of their federal constitutional rights under the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983. *Id.* They make claims under state law for violations of their Washington state constitutional rights (1) to "an education free of unreasonable interference from school district officials," and (2) "to equal access to their education without unreasonable restraint and isolation," and for the torts of negligence, outrage, and loss of consortium. *Id.* Plaintiffs seek damages and declaratory relief that the Defendants' conduct violated the federal constitution. *Id.,* at 30. The Defendants now move for summary dismissal of all Plaintiffs' claims under the Washington Constitution, all Plaintiffs' claims for negligence, and Plaintiff R.W.'s claim for outrage. Dkt. 41. For the reasons provided below, the motion to strike (Dkt. 51) should be denied, and the motion for partial summary judgment (Dkt. 41) should be granted, in part, and denied, in part.

**I.   RELEVANT FACTS AND PENDING MOTION**

**A. FACTS**

According to Plaintiffs, grade school children R.W., J.D., A.L., J.M.B., and W.L. were general education students (students without an individualized education plan ("IEP")) who were placed in a four foot by four foot isolation booth for discipline purposes without parental consent. Dkts. (R.W.) 50, at 2; (J.D.) 49, at 2; (A.L.) 48, at 2; (J.M.B.) 46, at 2; (W.L.) 47, at 2.

Mint Valley did not inform J.D., A.L., J.M.B. and W.L.'s parents/guardians that the children had been put in the isolation booth. Dkt. 49, at 2; 48, at 2; 46, at 2; 47, at 2. R.W.'s parents learned that he was put in the booth only after a general letter about the existence of the booth was sent home and R.W. told them. Dkt. 50, at 2. Each of the children assert that they suffered psychological injuries as a result. Dkt. 45-1, at 285-287.

The isolation booth was in Mint Valley's Children's Learning Center ("CLC") run by special education teacher Jerry Stein and also staffed by para-educator Kimberly Rambo. Dkt. 45-1, at 45. It was a solid structure, had two small "peep" holes in front, and a Plexiglas roof with small holes. Dkts. 45-1, at 51 and 218-219. Although the Washington Administrative Code ("WAC") 392-172A-03130 (2) (c) (which was in effect at the time), required the enclosure to "permit continuous visual monitoring," the booth did not have a window. *Id*. It had curved padded walls. Dkt. 45-1, at 60. There was a handle on the door, and a bar that would rotate to hold the door closed. Dkt. 45-1, at 52. At least some of the time, Mr. Stein or others would not remain at the door, but would bar the door and walk away, contrary to WAC 392-172A-03130 (2) (e) which required "either the student be capable of releasing himself" or be "within the view of an adult." Dkt. 45-1, at 52 and 164. Sometimes referred to as a "calming room" or "the box," the isolation booth was supposed to be used for children with IEPs that provided for its use and only with parental consent. Dkts. 42-1; 45-1, at 186.

The CLC staff were given "Right Response" training. Dkt. 45-1, at 345. This training, according to Plaintiffs' expert, Christopher Jones, Ph.D., did not include any training on the use of an isolation booth. Dkt. 45-1, at 133-134. Ms. Rambo did not consider, nor was she educated, on the psychological impact that could result from placing a child in the booth. Dkt. 45-1, at 186-188.

**R.W.**

R.W. was placed in the isolation booth on October 31, 2012 while he was in the first grade. Dkt. 45-1, at 225. According to R.W., he was put into the booth because he kept "showing kids [his] pictures when [he] wasn't supposed to," and kept standing up (not sitting still). Dkt. 45-1, at 226-227. R.W. testified that Mr. Stein "pulled [him] by [his] arm," and at first R.W. "walked calmly," and entered the box "because [he] didn't want to get into trouble." *Id.*, at 227-228. R.W. thought it was "scary," so he began yelling and "cussing," and kicking at the door. *Id.*, at 229.

According to Ms. Rambo, R.W. was placed in the isolation booth because he was "out of control, running around the room, trying to run out of the room, kicking his shoes off, throwing his shoes, jumping off chairs, tipping chairs, throwing things, crawling under tables, kicking them up in the air." Dkt. 42-1, at 9. Ms. Rambo states that Tracy Gould was in the CLC with her, but, Mr. Stein was not. *Id.* Ms. Rambo testified that she first attempted to "distract and derail" R.W. for around 20 minutes. *Id.*, at 12. At one point, he went into the bathroom and started banging the stall door. *Id.* They told him to stop, and directed him to come out. *Id.* He came "charging out at [Ms. Gould], just hitting and kicking and just in a rage, just out of control again." *Id.* Ms. Rambo was able to grab his hands and did a "seated chair hold," which was part of her Right Response training. *Id.* This was the first time she tried a chair hold, and while she was holding him, he was bucking, scratching, and squirming. *Id.,* at 14. Ms. Gould testified that R.W. was trying to head butt Ms. Rambo, bite her, and was screaming. Dkt. 42-2, at 2. Thinking it was best "to separate and allow him to de-escalate," Ms. Rambo then got him into the booth. Dkt. 42-1, at 12. He continued to scream. *Id.* Principal Patrick Kelly entered the room and let

R.W. out of the booth. *Dkt. 42-2, at 4*. According to Ms. Gould, R.W. began to run around the room again screaming, hitting and kicking. *Id.*

His mother, Cecilia Wilson, testified that the school called her to come pick up R.W. Dkt. 45-1, at 236. When she and her husband, Kevin, arrived, someone in the office made a call and asked "if it was okay to send [them] down." *Id.* Another woman met them, and as they approached the room, they could hear R.W. screaming. *Id.,* at 237. As they entered, they could see Principal Kelly, holding R.W. with his arms back and R.W. was "screaming and yelling . . . his hair was all wet . . . and he had no shoes on." *Id.,* at 237-238. Ms. Wilson tried talking to R.W., who continued to scream, and when she asked about his shoes, a woman in the room said "R.W., were you jumping in puddles?" *Id.*, at 239. R.W. responded, "No." *Id.*, at 250. Ms. Wilson noted that his socks and pants were wet and his shoes were dry. *Id.,* at 245. Principal Kelly let R.W. go. *Id.*, at 240. According to Mr. Wilson, when he asked "what happened," he was told R.W. "wouldn't listen" and they had to "hold him down." *Id.,* at 251. Mr. and Ms. Wilson left with R.W. before asking for more information because they were in shock. *Id.,* at 240. After that, they had trouble getting R.W. to go to school, he kept complaining of stomachaches, etc. *Id.,* at 242.

Ms. Wilson testified that around a month later, a letter came home in R.W.'s backpack, which she began to read aloud. Dkt. 45-1, at 241. The letter indicated that there was an isolation booth at Mint Valley, which had been the "subject of Facebook posts and media inquires," due to a student having observed use of the booth, and having related those concerns to his family. *Id.,* at 241 and 262. According to Ms. Wilson, R.W. stopped her, and told her for the first time that he was placed in the booth on Halloween. *Id.* R.W. related that it was "dark and that he could not get out, and he was screaming and yelling and hitting the walls trying to get out." *Id.* at 255.

Ms. Wilson called Principal Kelly, told him what R.W. related about being put in the booth, and Principal Kelly asked her to come in for a meeting. *Id.,* at 243. There was media at the school. *Id.*, at 245. When Mr. and Ms. Wilson walked into the meeting, Ms. Wilson asserts that Principal Kelly said, "I just want to let you guys know that I told him not to do it, it wasn't right for his treatment, and they did it anyways." *Id.*, at 245.

**J.D**.

J.D. testified that during his fourth grade year he was sent to Mr. Stein's class and put in the booth for talking too much with his friends. Dkt. 45-1, at 58. He states that as he arrived, he was not screaming or throwing a fit; they just "waved" him into the box. Dkt. 45-1, at 59-60 and 66. According to J.D., the second time he was put in the booth was when he made a mess eating a cupcake. Dkt. 45-1, at 62-63. He states that he was told to go to the bathroom, clean his face, which he did, and when he returned he saw the same man he had when he was put in the box the first time. Dkt. 45-1, at 63-64. J.D. just followed him out of the room and was "waved" into the box. Dkt. 45-1, at 64-66. He complied. *Id.* The man did not touch J.D. and they did not talk to one another. *Id.* J.D. was a fourth grade student at Mint Valley in the 2009-2010 school year. Dkt. 49, at 1.

**A.L.**

A.L. testified that while in the second grade, he was placed in the isolation box for: (1) around 30 minutes for playing tag, which was against the rules, (2) for bullying another student, and (3) for running out of the building because he was afraid of being put back in the isolation booth for making a mess, after another student tipped his lunch tray over. Dkt. 45-1, at 3-18. A.L.'s second grade year was in 2012-2013. Dkt. 48, at 1.

A.L. told his mother, Candi Landis, that he was being placed in the booth on and off in the middle of November 2012. Dkt. 45-1, at 332-333. She called the school, and they said they'd have the principal call her back. *Id.,* at 333. He did not do so until early December. *Id.* Ms. Landis attended a meeting, which at the school's request, included A.L. *Id.*, at 334-335. A man questioned A.L., who was nervous and scared, about the booth. *Id.* After that, Ms. Landis transferred A.L. to a different school, telling Principal Kelly that A.L. "was scared to death of [Mint Valley]." *Id.,* at 335.

**J.M.B.**

J.M.B. testified that she was sent to Mr. Stein's room to complete homework on occasion. Dkt. 45-1, at 28-29. Once, while in the first grade, she was sent to his room for talking, became upset, started screaming, tried to leave, and he put her in the booth. Dkt. 45-1, at 30-34. She was there about six minutes. *Id.,* at 34. J.M.B. testified that she was placed in the box a second time for throwing a chair. *Id.*, at 37. Her teacher called Mr. Stein, who walked her down to the special education room, and once he tried putting her in the booth, she started "yelling and screaming and . . . kicking the box." *Id.*, at 37-39. J.M.B. couldn't remember how long she was in the box, but thought it was longer than the first time. *Id.* She was at Mint Valley for the last half of first grade and first half of second grade in the calendar year 2012. Dkt. 46, at 2.

**W.L**.

W.L. testified that he was placed in the isolation box three times during his second grade year, which was in 2012-2013. Dkts. 45-1, at 156-157; 47, at 1. He was placed in the box when he would have a "blow out" over a test score or wanting to go to the bathroom and not being allowed to do so. Dkt. 45-1, at 156-157. W.L. was in the box anywhere from 10-20 minutes. *Id.* According to W.L., at one point, he was in Mr. Stein's room for other purposes, and realized that

another child was in the box. *Id.,* at 164. W.L. testified that there was no one else in the room, and so, he opened the door, let the other child out of the box, and ran away. *Id.*

**The Booth**

Around five days after media coverage of the use of the booth, the isolation booth was removed from Mint Valley on December 2, 2012 and destroyed. Dkt. 45-1, at 108. It was destroyed despite concerns that the district may have legal liability based on its use. Dkt. 45-1, at 113. Pictures remain.

**B. PENDING MOTION**

Defendants now move for partial summary judgment. Dkt. 41. They assert that all the Plaintiffs' Washington State Constitutional claims should be dismissed because violations of the Washington State Constitution are not independently actionable torts. *Id.* Defendants move for dismissal of all the Plaintiffs' claims for negligence against the school district. *Id.* Defendants then argue that under RCW 28A.600.015, the disciplinary actions taken against R.W. were "non-discretionary" as defined in RCW 28A.600.015 (6)(d) because it was for "behavior that adversely impacts the health or safety of other students or educational staff," and so, under RCW 28A.600.15 (9), it should not be held liable. *Id.* No other Plaintiffs' situations were discussed. *Id.* Defendants also move for dismissal of R.W.'s claim for outrage, asserting that it their response to his behavior was not outrageous in the circumstances. *Id.*

Plaintiffs argue that they can assert claims under the state constitution. Dkt. 44. They assert that none of their garden variety negligence claims are barred by RCW 28A.600.15. *Id.* They maintain that the there are issues of fact as to whether the Defendants' conduct toward R.W. was outrageous. *Id.*

1    Defendants move to strike the majority of Plaintiffs' response as irrelevant and improper.

2    Dkt. 51. They assert that the Plaintiffs' recital of facts pertaining to Plaintiffs other than R.W. is

3    unnecessary. *Id.* The Defendants note that the motion to dismiss the outrage claim only pertains

4    to R.W. *Id.* The Defendants then reassert that the Washington Constitution claims should be

5    dismissed as to all Plaintiffs, all Plaintiffs' negligence claims against the school district should be

6    dismissed pursuant to RCW 28A.600.15, and that R.W.'s outrage claim should be dismissed. *Id.*

### C. ORGANIZATION OF OPINION

This opinion will first address Defendants' motion to strike (Dkt. 51) and provide the standard on a motion for summary judgment and for application of substantive state law. It will then address the motion for partial summary judgment by claim in the following order: claims for violations of the Washington State Constitution, for negligence, and for outrage.

## II. DISCUSSION

### A. DEFENDANTS' MOTION TO STRIKE

Defendants' motion to strike (Dkt. 51) should be denied. Defendants assert that the Plaintiffs' inclusion of information about all Plaintiffs is irrelevant and unnecessary, but Defendants move for dismissal of all Plaintiffs' claims for negligence. Further, although not all of Plaintiffs' submissions were directly related to a claim, they were useful for background information and considered on a limited basis.

### B. SUMMARY JUDGMENT STANDARD

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56 (d). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors Association*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, T.W. *Elect. Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888-89 (1990).

**C. STATE LAW APPLIES TO THE SUBSTANTIVE QUESTIONS**

In moving to dismiss certain of Plaintiffs' state law claims, the substantive questions at issue here arise under state law. "When interpreting state law, federal courts are bound by decisions of

the state's highest court. In the absence of such a decision, a federal court must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Vestar Dev. II, LLC v. Gen. Dynamics Corp.*, 249 F.3d 958, 960 (9th Cir. 2001). "[W]here there is no convincing evidence that the state supreme court would decide differently, a federal court is obligated to follow the decisions of the state's intermediate appellate courts." *Id.*

**D. CLAIMS FOR VIOLATIONS OF THE WASHINGTON STATE CONSTITUTION**

Plaintiffs assert claims under the Washington State Constitution, Art. IX, § 1, which provides: "[i]t is the paramount duty of the state to make ample provision for the education of all children residing within its borders, without distinction or preference on account of race, color, caste, or sex."

The Defendants' motion (Dkt. 41) should be granted and Plaintiffs' claims under the Washington State Constitution should be dismissed. Washington courts "have consistently rejected invitations to establish a cause of action for damages" based on state constitutional violations "without the aid of augmentative legislation," like exists federally in 42 U.S.C. § 1983, which provides a civil cause of action for violation of the federal constitution. *Reid v. Pierce County,* 136 Wn.2d 195, 213-214 (1998) *Blinka v. Washington State Bar Ass'n*, 109 Wn. App. 575, 591 (2001)(*review denied*). There is no state statute comparable to Section 1983 entitling plaintiffs to damages for violations of the Washington State Constitution, *Blinka,* and Plaintiffs point to none. Their citation to *Porter v. Seattle Sch. Dist. No.1*, 160 Wn. App. 872, 882 (2011), *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist., No. 1*, 149 Wn.2d 660, 682 (2003) and *McCleary v. State*, 173 Wn.2d 477 (2012) is unhelpful.

In *Porter*, a group of parents challenged the Seattle School Board's decision to use certain math curriculum pursuant to a state statute, RCW § 28A.645.010, which permits "[a]ny person, or persons . . . aggrieved by any decision or order of any school official or board, within thirty days . . . may appeal the same to the superior court of the county in which the school district or part thereof is situated." After concluding that the school board did not act arbitrarily and capriciously in making their decision, Division I of the Washington Court of Appeals turned to the parent's challenge against the school board under the Art. IX § 1 of the Washington Constitution. *Porter,* at 882. The court found that it "article 9, by its express language, places a duty only on the State, not on school districts," and so, did not apply there. *Porter,* at 882.

In *Parents Involved,* the Washington State Supreme Court, answered a certified question as to whether the Seattle School District No. 1's open choice enrollment program, which, in part, used race as a "tie-breaker" in determining which high school a student attended, violated certain of Washington's statutes and its constitution. The *Parents Involved* Court made its' decision solely on the statutory question, specifically holding that it need not reach the questions regarding the state constitution. *Id.,* at 682.

*McCleary* was a declaratory action brought by parents and an advocacy group alleging that the State failed to properly fund Washington's public schools in violation of Article IX § 1 of the Washington State Constitution. The *McCleary* Plaintiffs did not seek monetary damages.

None of these cases stand for the proposition that Plaintiffs can assert a claim for damages under Article IX of the Washington State Constitution. Defendants' motion (Dkt. 41) should be granted and Plaintiffs' claims for violations of the Washington State Constitution should be dismissed.

**E. ALL PLAINTIFFS' CLAIMS FOR NEGLIGENCE**

The elements of negligence are duty, breach, causation, and damages. *Keller v. City of Spokane,* 146 Wn.2d 237, 343 (2002). In Washington, "a school has a special relationship with the students in its custody" resulting in an enhanced duty of care, that is: "to protect them from reasonably anticipated dangers." *Christensen v. Royal Sch. Dist. No. 160*, 156 Wn.2d 62, 70 (2005)(*internal quotations and citations omitted*). To establish "reasonably anticipated dangers" or "foreseeability, the harm sustained must be within a general field of danger that should have been anticipated. Acts are foreseeable only if the district knew or in the exercise of reasonable care should have known of the risk that resulted in the harm." *Hopkins v. Seattle Pub. Sch. Dist. No. 1*, 195 Wn. App. 96, 108 (2016), (*review denied sub nom. Hopkins v. Seattle Pub. Sch. Dist.*, 186 Wn.2d 1029 (2016)).

Defendants' motion to summarily dismiss Plaintiffs' claims for negligence (Dkt. 41) should be denied. Defendants do not address any of the elements of negligence in their motion, but, instead, Defendants assert that Plaintiffs' claims for negligence should be dismissed pursuant to RCW 28A.600.015 and then discuss R.W.'s behavior on October 31, 2012. Dkts. 41 and 51. Defendants make no showing that RCW 28A.600.015 in some manner mandates dismissal of all the Plaintiffs' negligence claims or even of R.W.'s negligence claim. Further, even if it did act as a bar to Plaintiffs' negligence claims, RCW 28A.600.015 was amended in 2016 to add the provisions upon which Defendants rely. Defendants make no showing that those new sections of RCW 28A.600.015 apply retroactively.

The statute does not mandate dismissal of Plaintiffs' negligence claims. Under RCW 28A.600.015 (1), the superintendent of public instruction is directed to "adopt and distribute to all school districts" rules "prescribing the substantive and procedural due process guarantees of pupils in the common schools." These "rules shall authorize a school district to use informal due

process procedures in connection with the short-term suspension of students to the extent constitutionally permissible: PROVIDED, That the superintendent of public instruction deems the interest of students to be adequately protected." The statute goes on to provide:

> (2) Short-term suspension procedures may be used for suspensions of students up to and including, ten consecutive school days.
>
> (3) Emergency expulsions must end or be converted to another form of corrective action within ten school days from the date of the emergency removal from school. Notice and due process rights must be provided when an emergency expulsion is converted to another form of corrective action.
>
> (4) School districts may not impose long-term suspension or expulsion as a form of discretionary discipline.
>
> (5) Any imposition of discretionary and nondiscretionary discipline is subject to the bar on suspending the provision of educational services pursuant to subsection (8) of this section.
>
> (6) As used in this chapter, "discretionary discipline" means a disciplinary action taken by a school district for student behavior that violates rules of student conduct adopted by a school district board of directors under RCW 28A.600.010 and this section, but does not constitute action taken in response to any of the following: . . .
>
>> (d) Behavior that adversely impacts the health or safety of other students or educational staff.
>
> (7) Except as provided in RCW 28A.600.420, school districts are not required to impose long-term suspension or expulsion for behavior that constitutes a violation or offense listed under subsection (6)(a) through (d) of this section and should first consider alternative actions.
>
> (8) School districts may not suspend the provision of educational services to a student as a disciplinary action. A student may be excluded from a particular classroom or instructional or activity area for the period of suspension or expulsion, but the school district must provide an opportunity for a student to receive educational services during a period of suspension or expulsion.
>
> (9) Nothing in this section creates any civil liability for school districts, or creates a new cause of action or new theory of negligence against a school district board of directors, a school district, or the state.

RCW § 28A.600.015.

Defendants argue that its response to R.W.'s behavior that day was "nondiscretionary discipline" as defined in RCW § 28A.600.015 (6)(d) because it R.W.'s behavior was "[b]ehavior that adversely impact[ed] the health or safety of other students or educational staff." Dkt. 41. Defendants then assert that none of the Plaintiffs can maintain a claim for negligence under RCW § 28A.600.015 (9) because it prohibits the creation of "civil liability for school districts," or the creation of "a new cause of action or new theory of negligence" against a school district. *Id.*

Defendants make no showing that even if their response to R.W.'s behavior was "nondiscretionary discipline," they are shielded from liability on a common law negligence claim based on the statutory language of RCW § 28A.600.015. This statute relates to the creation of rules regarding suspension and expulsion of students, what constitutes long and short term suspensions, the process, use, limitations and requirements of the school while a student has been suspended or expelled. It does not provide immunity from suit for common law negligence claims like the ones Plaintiffs assert here.

The statute does not apply retroactively. The section upon which Defendants point, section 9, was not added to RCW § 28A.600.015 until June of 2016 (indeed sections (4)-(8) were not added until then either), well after the last student was allegedly placed in the booth in 2012. Washington courts "presume statutory amendments are prospective unless there is a legislative intent to apply the statute retroactively or the amendment is clearly curative or remedial." *Houk v. Best Dev. & Const. Co., Inc*., 179 Wn. App. 908, 911 (2014). "An amendment is curative and retroactive if it clarifies or technically corrects an ambiguous statute." *Id.*, at 913. There is no evidence in the record that the legislature intended these new provisions to apply retroactively.

There is no evidence that the changes were "clearly curative or remedial" of an ambiguous statute.

Defendants make no showing that RCW § 28A.600.015 bars Plaintiffs' negligence claims against the school district or that the provisions upon which they rely should be applied retroactively.

Moreover, there are issues of fact as to each of the Plaintiffs' negligence claims, even R.W.'s claim. His version of what happened is quite different from others there that day. The motion to summarily dismiss this claim should be denied.

**F. R.W.'S CLAIM FOR OUTRAGE**

In Washington, "[t]he tort of outrage requires the proof of three elements: (1) extreme and outrageous conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe emotional distress." *Kloepfel v. Bokor*, 149 Wn.2d 192, 195 (2003). Any claim for outrage "must be predicated on behavior so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.,* at 196 (*internal quotations and citation omitted*).

There are substantial material issues of fact as to what happened with R.W. on October 31, 2012. His version of events is very different than Ms. Rambo's or the other adult's. Crediting the facts in his favor, as is proper in a motion for summary judgment, there is at least evidence that Defendants' conduct was sufficiently extreme, intentional, and resulted in severe distress to R.W. for the motion to be denied.

**G. CONCLUSION**

The Defendants' motion to strike (Dkt. 51) should be denied.  Defendants' motion to summarily dismiss Plaintiffs' claims based on violation of the Washington State Constitution (Dkt. 41) should be granted and those claims dismissed.  Defendants' motion to summarily dismiss Plaintiffs' negligence claims and R.W.'s outrage claim (Dkt. 41) should be denied.  There are sufficient issues of fact precluding summary judgment on these claims at this time.

### III.    ORDER

Therefore, it is hereby **ORDERED** that:

- Defendants' motion to strike (Dkt. 51) **IS DENIED**;
- Defendants' Partial Motion for Summary Judgment (Dkt. 41) **IS**:
    - **GRANTED** as to Plaintiffs' Washington State Constitution claims;
    - **DENIED** in all other respects; and
        - Plaintiffs' claims for violations of the Washington State Constitution **ARE DISMISSED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing pro se at said party's last known address.

Dated this 19th day of October, 2017.

_____
ROBERT J. BRYAN
United States District Judge